## GRAND FRATERNITY v. MARY E. GREEN.

### Decided October 20, 1910.

**1.—Life Insurance—Suicide—Evidence.**

In a suit upon a certificate of life insurance, the defense being suicide by carbolic acid, evidence reviewed and held sufficient to support a finding that the insured did not commit suicide.

**2.—Same—Presumption.**

The presumption is against suicide, and where an insurance company relies upon that fact as a defense it has the burden of proving it.

Appeal from the District Court of Tarrant County. Tried below before Hon. Jas. W. Swayne.

*R. E. Bratton* and *Eckford & Cooke,* for appellant.

*Orrick & Terrell,* for appellee.

WILLSON, CHIEF JUSTICE.—By the terms of a certificate issued to B. E. Green November 18, 1901, in force May 31, 1908, when he died,

The United Moderns, a mutual benefit association, undertook within ninety days after proof of his death had been furnished to it to pay to his wife, if she survived him, the sum of $1000. The United Moderns and The Grand Fraternity, a similar association, afterwards consolidated—the consolidated association continuing the business and assuming the liabilities of the old associations under the name "The Grand Fraternity." As the beneficiary of the certificate so issued to Green, appellee, his wife, recovered the judgment from which this appeal is prosecuted.

The constitution and laws of The United Moderns in force at the time the certificate was issued, and made a part of it, declared that "if any member dies . . . by self-destruction, whether sane or insane, . . . the beneficiary's certificate together with all claims by reason of membership shall be null and void." Appellant's contention was that Green was a suicide, and it insists here that the evidence so conclusively established its contention that the trial court should have peremptorily instructed the jury to return a verdict in its favor. From testimony in the record it appears that Green died in the City Park in Fort Worth on a Sunday afternoon, in plain view; had their attention been directed to him, of several people then at a distance from the point where he died of about one hundred yards. The attention of the witness Hoffman seems first to have been attracted to him. · Green was then near one of the roadways in the park, "in a reclining position," the witness stated, "sitting on the ground leaning against a tree," with his left leg "crossed over his right knee, his hands lying on his lap"—"in the position," the witness further stated, "a man would ordinarily assume who was sitting down reclining up against a tree." Hoffman's attention was attracted to him, in passing near him, "by the extremely pale and deathlike look on his face." "His expression," the witness stated, "was just like a man who was almost dead. I thought he was. dead when I first saw him." Going to Green,·Hoffman found he was alive, and tried to arouse him by shaking him, but failed. Two gasps for breath were the only movements deceased made after Hoffman reached him. Lying on the ground by Green's side was a small mug, empty; and lying on the ground fifteen or twenty feet in front of him, and across a park walk, was a two-ounce bottle with the Renfro Drug Store label for carbolic acid, also empty, or nearly so. Both the mug and the bottle had an odor of carbolic acid. A justice of the peace, who had been notified of Green's death, reached him within a short time after he died, and on the trial testified that on an examination of the deceased's body made before same was removed from the park, he found, on pulling open deceased's mouth, that his tongue was white, "like it was parched and blistered." "It looked to me," the witness said, "like the tip of the tongue was parched." This witness did not find that any other part of the interior of Green's mouth appeared to be otherwise than normal, but another witness (Mann) testified that the deceased's mouth "was all burned inside and on the tongue, too, . . . all the inside of his mouth looked white, so far as I could see,

and that was back to the curve of the throat." The justice of the peace and a number of other witnesses testified that there was no appearance of a burn on Green's lips, nor on any part of the exterior of his mouth. It further appeared from the testimony that at the time of his death Green was about fifty-seven years of age, and was then, and for quite a while before that time had been, suffering from blood-poisoning in his right hand, which he treated by applying carbolized water thereto; that for this purpose he carried around with him and used the mug found near him; that he procured all drugs used by him and by his family from Pangburn's drug store, and never from the Renfro drug store; that on the morning of the day he died he had obtained from the Pangburn drug store a bottle of carbolic acid, which at the time he died was in the bath room of his residence, several blocks from the park where he died. Physicians testified that according to circumstances and the quantity administered death from carbolic acid might be instantaneous or otherwise. "When death is instantaneous," said one of said physicians, "paralysis takes place in the motor center of respiration in the brain. When that happens the man just drops like a shot." In cases where death is not instantaneous, the suffering of the patient, physicians stated, is intense, causing him to writhe, cry out and breathe stertorously. A paralysis of the respiratory organs produced by the drug, one of them testified, would cause a patient's face to take on a bluish color. It was shown by evidence of the physicians that the tongue of a person in bad health frequently has a white coat. Testimony was offered and admitted tending to show it to be improbable, if not impossible, that Green could have drunk from the mug carbolic acid sufficient to have produced his death without leaving on his lips, other parts of his face, or a mustache worn by him, any evidence of the use by him of the drug. Testimony also was admitted tending to show that it would not have been possible, if Green's death was caused by carbolic acid and was not instantaneous, for him to have died in the peaceful and apparently painless way he did die. And testimony also was heard tending to show, the jury had a right to believe, that his death was due to heart failure. Aside from the presumption arising that Green's death was not suicide (Mutual Life Ins. Co. v. Simpson, 28 S. W., 840). We think it is apparent from the testimony cited that a question for determination by the jury as to the cause of his death was presented, and that their finding that he did not destroy his own life can not be said to have been wholly without evidence to support it.

There are assignments presenting other objections to the judgment, but we think they are without merit. The judgment will be affirmed.

*Affirmed.*